IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

TONIA BUNTYN,

    Plaintiff,

v.                                                      No. 13-1046

CAROLYN W. COLVIN, Commissioner
of Social Security,[1]

    Defendant.
_____

OPINION
_____

### *INTRODUCTION AND PROCEDURAL BACKGROUND*

This action was brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) by the Plaintiff, Tonia Buntyn, seeking judicial review of the final decision of Carolyn W. Colvin, Commissioner of Social Security, denying her claim for Supplemental Security Income. She applied for benefits on March 2, 2010, alleging disability from November 1, 2008. Her application was denied initially and on reconsideration. Following a hearing on July 7, 2011, Administrative Law Judge (ALJ) Jerry Lang denied Buntyn's claim. Her request for review by the Appeals Council was denied and this action followed.

### *STANDARD OF REVIEW*

It is the task of the Commissioner to determine whether a claimant is entitled to benefits under the Social Security Act. *Sorrell v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 4245467, at *4 (6th Cir. Aug. 11, 2016). A federal court's review of the Social Security

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

Administration's denial of a claim for benefits "is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014). "Substantial evidence requires more than a mere scintilla but less than a preponderance; substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (internal quotation marks omitted). To determine whether substantial evidence supports the ALJ's decision, the court must examine the administrative record as a whole and "take into account whatever in the record fairly detracts from its weight." *Conner v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 4150919, at *4 (6th Cir. Aug. 5, 2016) (quoting *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). "This standard presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Sorrell*, 2016 WL 4245467, at *4 (internal quotation marks omitted). That is, "[i]f substantial evidence supports the ALJ's decision, then reversal is unwarranted even if substantial evidence backs the opposite conclusion." *Turk v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 2641196, at *1 (6th Cir. May 10, 2016) (citing *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). The reviewing court may not "resolve conflicts in evidence or decide questions of credibility." *Conner*, 2016 WL 4150919, at *4.

To establish eligibility for disability benefits, an applicant must show an inability to engage in any substantial gainful activity resulting from a long-lasting impairment. 42 U.S.C. § 1382c(a)(3)(A); *Taskila v. Comm'r of Soc. Sec.,* 819 F.3d 902, 903 (6th Cir. 2016).

> The Social Security Administration processes applications for relief by asking five questions: (1) Does the claimant show she is not engaged in substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet any one of the items on a list of impairments presumed severe enough to render one disabled? (4) Can the claimant perform her past jobs? (5)

> Can the claimant perform other jobs that exist in significant numbers in the national economy?

*Taskila*, 819 F.3d at 903 (internal quotation marks omitted). This standard has been described as a "modest" one. *See id.* at 904. "The burden of proof lies with the claimant until the final step of this inquiry, when it falls to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Crum v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 4578357, at *4 (6th Cir. Sept. 2, 2016) (per curiam) (internal quotation marks omitted).

*RELEVANT RECORD EVIDENCE*

On the date of the hearing before the ALJ, the claimant was thirty-nine years old. (D.E. 6-3 at PageID 56.) She had an eleventh-grade education and had held jobs as a housekeeper, factory worker and cashier. (D.E. 6-7 at PageID 138-39.)

The record indicates that Buntyn was treated at Madison Family Walk-In Clinic in Jackson, Tennessee, beginning in July 2004. (D.E. 6-11 at PageID 338.) Examination notes from July 8, 2005, reported that she had suffered back pain dating back to the 1990s. (D.E. 6-8 at PageID 188-89.) In September 2005, she was diagnosed as obese, with a height of five feet and weight of 231 pounds. (*Id.* at PageID 190-91.) She was instructed in November 2005 to follow an 800-calorie American Diabetes Association (ADA) diet for weight loss. (*Id.* at PageID 194-95.)

Plaintiff presented to the clinic on April 20, 2007, complaining of right knee pain. (*Id.* at PageID 202.) X-rays revealed mild degenerative changes with no acute fracture or dislocation. (D.E. 6-9 at PageID 249.) Soft tissues were normal. (*Id.*) Magnetic resonance imaging showed anterior cruciate ligament tears, but claimant did not want to have surgery, advising that the pain was "usually tolerable" with medication. (D.E. 6-8 at PageID 214-19.)

On March 23, 2009, she was diagnosed with thoracic and lumbar pain, bilateral arm and hand pain, and Type II diabetes. (*Id.* at PageID 234-35.) On her return to the clinic a month later, she received a diagnosis of right carpal tunnel syndrome. (D.E. 6-9 at PageID 237-38.) She continued to be treated for back pain from late April to mid-June 2009. (*Id.* at PageID 239-46.) Laboratory results from a June 13, 2009, comprehensive metabolic panel reflected an A1C$^2$ level of 10.6. (*Id.* at PageID 265.)

Records from internist Mahendra Joshi, M.D., showed that Buntyn was treated for back pain, diabetes, obesity, hyperlipidemia and lumbosacral radiculopathy. (*Id.* at PageID 275-77.) Plaintiff visited Dr. Joshi for the first time on July 28, 2009, complaining of back and leg pain on the right side for the preceding four weeks. (*Id.* at PageID 284.) At that time, she weighed 228 pounds, had a Body Mass Index (BMI) of 44.6 and an A1C of 9.1. (*Id.* at PageID 284-86.) The physician prescribed 500 milligrams of Metformin twice daily and forty-five units of Lantus at bedtime for her diabetes. (*Id.* at PageID 285.) Claimant was advised to lose weight, exercise as tolerated, keep detailed records of her blood sugar levels and receive physical therapy. (*Id.* at PageID 285.) The report on a Sensory Conduction Study stated that "[h]igher amplitudes identify pathology with statistical sensitivity approaching 100%" and "[l]umbar radiculopathy can be objectively confirmed with lateral bending radiographic studies." (*Id.* at PageID 289.)

On August 11, 2009, Buntyn returned, again complaining of right leg and back pain. (*Id.* at PageID 281.) Her BMI was 44.8, weight 229 pounds and A1C 9.1. (*Id.* at PageID 281-82.) Dr. Joshi recorded paraspinal tenderness and straight leg raise positive at thirty degrees. (*Id.* at PageID 281.) There was mild swelling of the right knee joints with decreased range of

---

$^2$An A1C test is used to determine blood sugar level. For someone who does not have diabetes, the normal A1C is below 5.7 percent. www.mayoclinic.org/tests-procedures/a1c-test/details/results/rsc-20167939.

movement and crepitus. (*Id.*) Plaintiff reported pain on weight bearing and pressure. (*Id.*) An electrocardiogram (EKG) indicated non-specific T-wave abnormalities. (*Id.* at PageID 282.) An Arterial PV Study with acquisition of Doppler wave forms, PVR Waves at multiple levels and ABI-Indices at multiple forms of compression revealed normal peripheral arterial circulation at rest. (*Id.* at PageID 293.) Diagnoses included acute lumbago and claudication. (*Id.*) The Plaintiff was again advised to lose weight and have physical therapy for her back. (*Id.*)

On October 19, 2009, Buntyn had gained weight but maintained her A1C. (*Id.* at PageID 278-79.) Her Metformin dosage was increased to 1,000 milligrams twice daily and she was again advised to lose weight, exercise as tolerated and keep detailed records of blood sugar levels. (*Id.* at PageID 279.) Notes dated December 1, 2009, reflected that claimant also took Novolog injections to treat her diabetes. (*Id.* at PageID 276.) Examination on that date revealed paraspinal tenderness, joints within normal range with no effusion or tenderness, normal joint range of movement and normal gait. (*Id.* at PageID 276-77.) Buntyn advised Dr. Joshi that she was having back pain "off and on" but that it had not reached the point where she could not walk. (*Id.* at PageID 275.)

According to the record, the claimant began seeing internist Samuel O. Bada, M.D., on December 7, 2009, complaining of lower back pain. (D.E. 6-10 at PageID 313.) At that time, she reported taking 500 milligrams of Metformin twice daily. (*Id.*) He observed normal curvature of the spine without ecchymosis or erythema; vertebral spine and paraspinal tenderness with no costovertebral angle (CVA) tenderness; normal bilateral lower extremities; normal cranial nerves, sensory and motor; and normal deep tendon reflexes. (*Id.* at PageID 314-15.) Gait was unremarkable and range of motion was full with painful flexion. (*Id.*) She weighed

238 pounds and had a BMI of 46.48. (*Id.* at PageID 314.) Dr. Bada prescribed Percocet for her back pain. (*Id.* at PageID 315.)

She returned for monthly follow-ups thereafter. On January 6, 2010, she was still in pain. (*Id.* at PageID 317.) Her blood glucose level was 409 and her weight 234 pounds. (*Id.*) She reported that she walked for exercise "sometimes." (*Id.*) Percocet was replaced with extended release morphine tablets. (*Id.* at PageID 318.)

On February 4, 2010, the claimant advised that the morphine tablets nauseated her. (*Id.* at PageID 320.) Dr. Bada continued the morphine tablets and added twenty-five milligrams of Phenergan twice daily. (*Id.* at PageID 321.) He also prescribed 300 milligrams of Neurontin twice daily. (*Id.*) Follow up on March 9, 2010, showed a blood glucose level of 371, weight of 220 and BMI of 42.96. (*Id.* at PageID 323-24.) Percocet and morphine tablets were discontinued and 200 milligrams of Ultram extended release tablets once daily prescribed. (*Id.* at PageID 324.)

Buntyn apparently did not see Dr. Bada again until May 25, 2010, at which time he noted uncontrolled diabetes and constant bilateral back pain aggravated by movement. (*Id.* at PageID 326.) Notes from June 29, 2010, reflected the same impairments. (*Id.* at PageID 329.) A Lower Extremity Physiologic Study performed on that date was normal. (D.E. 6-15 at PageID 461.) The record showed that Levemir had been added to her diabetes treatment. (D.E. 6-10 at PageID 329.) On July 27, 2010, Dr. Bada increased the dosage of Levemir and added Amaryl tablets at a dosage of four milligrams. (*Id.* at PageID 307-08.) Plaintiff was again taking morphine tablets for back pain. (*Id.* at PageID 308.) The physician noted on August 27, 2010, that her back pain continued and that she was not taking her Metformin. (*Id.* at PageID 310.) Levemir was increased to fifty units per day. (*Id.*) Examination indicated normal peripheral pulses; normal

6

cranial nerves, sensory and motor; and no clubbing or edema of the extremities. (*Id.* at PageID 311.)

After a follow-up visit on January 14, 2011, Dr. Bada wrote in his progress notes that she had been "very difficult and noncompliant" with her care." (D.E. 6-17 at PageID 502.) He explained that he tried to send her to a pain clinic but no one would accept her insurance locally and she said she could not drive to a clinic farther away. (*Id.*) She also told him that her back pain had worsened and her current medications did not help. (*Id.*) She took the morphine only occasionally because it caused nausea and vomiting. (*Id.*) Plaintiff exhibited tenderness of the lower back, normal peripheral pulses and absence of clubbing or edema of the extremities. (*Id.* at PageID 503.) These symptoms were also noted on February 14, 2011. (*Id.* at PageID 499-500.) She was continued on Percocet for pain. (*Id.*) For her diabetes, injection dosages of Humalog were increased in January and February 2011, and Levemir in February. (*Id.* at 500, 503.) She was counseled on compliance. (*Id.* at PageID 500.)

In an office visit on March 3, 2011, Dr. Bada again noted that it had been "difficult" to control Buntyn's blood glucose levels because of her noncompliance. (*Id.* at PageID 496.) He observed mid and lower back tenderness, normal peripheral pulses and no clubbing or edema of the extremities. (*Id.* at PageID 497.) The same notations were made in March 2011. (*Id.* at PageID 491, 494.) Her Humalog dosage was again increased. (*Id.* at PageID 496.)

Dr. Bada examined the claimant on April 14, 2011, for complaints of worsening right knee pain following an injury the week before in which she "twisted" it. (D.E. 6-16 at PageID 486.) The physician noted that she occasionally failed to take her diabetes medications. (*Id.*) She had tenderness of the mid and lower back and normal peripheral pulses. (*Id.* at PageID 487.)

7

There was tenderness in the right knee with pain on flexion and extension, but no clubbing or edema of the extremities. (*Id.*)

In progress notes from May 13, 2011, Dr. Bada for the third time stated that Buntyn's noncompliance with the prescribed ADA diet, exercise and medication made it "very difficult to care for her." (*Id.* at PageID 483.) He further noted that her pain was "fairly controlled" by medication. (*Id.*) Examination revealed no clubbing or edema of the extremities, normal peripheral pulses, and no motor defect. (*Id.* at PageID 484.) At that time, Plaintiff was taking Percocet and morphine for pain. (*Id.* at PageID 484-85.)

State agency medical consultant Anita L. Johnson, M.D., completed a Physical Residual Functional Capacity (RFC) Assessment on June 14, 2010, opining that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds and stand, walk or sit for six hours in an eight-hour workday. (D.E. 6-9 at PageID 294-95.) She determined that the claimant had no exertional limitations with respect to pushing and/or pulling and could climb, balance, stoop, kneel, crouch and crawl frequently. (*Id.* at PageID 295-96.) Dr. Johnson identified no manipulative, visual, communicative or environmental limitations. (*Id.* at PageID 297-98.) At the time of her assessment, there was no medical source statement regarding Buntyn's physical capacities in the file. (*Id.* at PageID 300.) Based on her review of the medical records before her, it was the consultant's opinion that the claimant's impairments, though severe, fell short of the Social Security Administration's Listing of Impairments and that her RFC was for light work. (*Id.* at PageID 301.) A second state agency medical consultant, Frank R. Pennington, M.D., affirmed Dr. Johnson's assessment on August 10, 2010. (*Id.* at PageID 303.)

Dr. Bada completed a medical source statement dated January 14, 2011, opining that his patient could occasionally lift and/or carry less than ten pounds and frequently lift and/or carry five pounds, based on chronic lower back pain and diabetic neuropathy affecting the arms and legs. (D.E. 6-10 at PageID 332-34.) He further related that she could stand and/or walk for less than two hours in an eight-hour workday because of neuropathy and back pain and sit for at least six hours, as sitting for longer periods of time resulted in back pain. (*Id.* at PageID 334.) She could occasionally climb, balance, stoop, crouch, kneel and crawl because she was easily fatigued and suffered lower back and leg pain; could not reach, handle, feel, see, hear or speak due to leg, back and hand pain as well as neuropathy; could not tolerate temperature extremes, chemicals, dust, noise, fumes or humidity because they made her dizzy and aggravated her lower back pain and neuropathy. (*Id.* at PageID 335-36.)

At the hearing before the ALJ, Buntyn testified that diabetes caused tingling pain in her arms, legs, hands and feet, for which she was treated with Neurontin by Dr. Bada. (D.E. 6-3 at PageID 57-58.) She related that, despite the medication, her feet and legs hurt when she tried to stand for more than an hour and that she had problems gripping and hanging onto things. (*Id.* at PageID 58-59.) Plaintiff reported that she suffered lower back pain "maybe every other day," which was exacerbated by lifting too much or standing too long. (*Id.* at PageID 59-60.) She also claimed that her blood sugar, which typically ran at around 400, made her weak and required her to frequently lie down to rest. (*Id.* at PageID 60-61.) The record indicated that she took care of her personal hygiene and grooming tasks, prepared meals daily, washed her clothes, cleaned, drove a car, went shopping for food and clothing, handled her finances, and spent her time reading. (D.E. 6-7 at PageID 155-60.)

*THE ADMINISTRATIVE DECISION*

Upon hearing testimony and reviewing the evidence, the ALJ determined that, although the claimant suffered from a severe combination of impairments including diabetes mellitus, lumbar radiculopathy and obesity, she did not have an impairment or combination of impairments that met or equaled in severity one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (D.E. 6-3 at PageID 44.) It was the opinion of the ALJ that Plaintiff possessed the RFC to lift twenty pounds occasionally and ten pounds frequently and stand, walk and sit for six hours in an eight-hour workday with frequent climbing, balancing, stooping, crawling, crouching and crawling. (*Id.* at PageID 46.) He further found that, due to her pain, she was limited to understanding, remembering and carrying out only simple job instructions. (*Id.*)

In arriving at an RFC for light work, the ALJ noted his reliance upon the determinations of the state agency medical consultants "because they are well supported by the longitudinal record[.]" (*Id.* at PageID 48.) He considered but accorded no weight to Dr. Bada's opinion "that the claimant is unable to perform even sedentary work because it is not supported by his own treatment notes documenting normal curvature of the spine, full range of motion in the back, normal cranial nerves, normal sensation, normal motor, and intact deep tendon reflexes." (*Id.* at PageID 49.) Based on his findings, the ALJ concluded that Buntyn was not disabled. (*Id.* at PageID 50.)

*ASSIGNMENTS OF ERROR AND ANALYSIS*

The Plaintiff asserts in this appeal that the ALJ erred in giving no weight to the opinion of Dr. Bada as set forth in his medical source statement of January 2011, relying instead on the conclusions of state agency medical consultants, and, as a result, reaching a decision concerning her RFC that was not supported by substantial evidence. The RFC "is the most [a claimant] can

still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). It is the Commissioner who has the final responsibility for deciding a claimant's RFC. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). The ALJ is required to incorporate into his RFC determination only those limitations he finds credible. *Irvin v. Soc. Sec. Admin.*, 573 F. App'x 498, 502 (6th Cir. 2014) (per curiam).

"[T]o require the ALJ to base [his] RFC finding on a physician's opinion[] would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd*, 531 F. App'x at 728 (internal quotation marks omitted). Rather, "[t]he ALJ determines a claimant's RFC based on evidence such as medical records, doctor's opinions, and the claimant's descriptions of her symptoms." *Stephenson v. Comm'r of Soc. Sec.*, 635 F. App'x 258, 263 (6th Cir. 2015). In deciding whether a claimant is disabled, the Commissioner must consider all of the medical opinions in the record. 20 C.F.R. § 416.927(b).

An ALJ is required to comply with certain standards in assessing medical evidence offered in support of a disability claim, set upon a presumptive sliding scale of deference. *Gentry*, 741 F.3d at 723; *Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 438-39 (6th Cir. 2012) (per curiam). At one end of the continuum is the non-examining source, such as a state agency medical consultant, who provides an opinion based solely on review of the claimant's existing medical records. *Norris*, 461 F. App'x at 439. This type of source is accorded the least deference. *Id.* However, the ALJ must consider the opinions of state agency medical consultants even though he is not bound by their findings, as such individuals are "highly qualified

11

physicians . . . and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(e)(2)(i).

At the opposite end of the spectrum lies the treating physician. *Norris*, 461 F. App'x at 439. The so-called "treating physician rule"

> requir[es] the ALJ to give controlling weight to a treating physician's opinion as to the nature and severity of the claimant's condition as long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. The premise of the rule is that treating physicians have the best detailed and longitudinal perspective on a claimant's condition and impairments and this perspective cannot be obtained from objective medical findings alone. Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Gentry*, 741 F.3d at 723 (internal alterations, citations & some quotation marks omitted). "An ALJ must provide 'good reasons' for discounting the opinion of a treating source, " *Cosma v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2016 WL 3209500, at *1 (6th Cir. June 10, 2016) (per curiam), although he is not required to engage in an "exhaustive factor-by-factor analysis," *Francis v. Comm'r, Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011). "The stated reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cosma*, 2016 WL 3209500, at *1 (internal quotation marks omitted). "The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence." *Santellan v. Comm'r of Soc. Sec.*, Case No. 1:15-cv-974, 2016 WL 4150651, at *5 (W.D. Mich. Aug. 5, 2016); *see also Norris*, 461 F. App'x at 439.

12

Here, the ALJ's stated reason for according no weight to the opinion contained in Dr. Bada's medical source statement was because it was unsupported by his own contradictory treatment notes. The ALJ discussed Dr. Bada's treatment of the Plaintiff over a period of several years at some length and in detail. His records showed that, although Buntyn suffered from back and leg pain, she had normal curvature of the spine, normal bilateral lower extremities, normal cranial nerves, normal deep tendon reflexes, normal gait, normal lower extremity physiologic study results and normal peripheral pulses. His notes reflected that, in January 2011, he recommended a pain clinic but she chose not to go and some four months later advised him that her pain was fairly controlled by medication. Dr. Bada apparently never expressed a need for surgical intervention for her back problems. The evidence contained in his treatment notes aligned with records from other treating sources, including documentation from Madison Family Walk-In Clinic indicating only mild degenerative changes in Plaintiff's right knee and her rejection of surgery because the pain was usually tolerable with medication and from Dr. Joshi showing normal joint range of movement and gait, and reports by the claimant that her back pain was off and on and had not reached the point where she had trouble walking. The ALJ found that the physician's "extremely restrictive" assessment was inconsistent with these records. An ALJ is "not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation," even if those doctors are treating physicians. *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). Dr. Bada's records were also replete with notations of her noncompliance with medications for diabetes and instructions on weight loss and diet, as well as the treatment challenges associated with that noncompliance. The ALJ reasonably took this fact into consideration in making his RFC determination.

The Court finds that the explanation of the ALJ for according little weight to Dr. Bada's medical source statement accounted for the factors he must consider and his reasons are supported by substantial evidence. *See Knox v. Colvin*, Civ. No. 5:15-CV-00039-GFVT, 2016 WL 4430932, at *6-9 (E.D. Ky. Aug. 17, 2016) (ALJ's explanation that he gave "little weight" to treating physician's opinion because it was "inconsistent with the objective medical evidence which reveals generally mild findings or imaging of [claimant's] spine, no need for surgical intervention since 2002, no significant treatment for chronic obstructive pulmonary disease or her cardiac condition since the previous decision, and that the claimant's mental health condition has improved with proper medication," sufficiently addressed factors to be considered in giving good reasons for discounting the opinion of a treating source); *Tratar v. Comm'r of Soc. Sec.*, No. 13-12262, 2014 WL 4964784, at *5 (E.D. Mich. Oct. 3, 2014) (ALJ's explanation that he discounted treating physician's statement that the claimant was unable to work because it was inconsistent with her work history, reported daily activities and medical evidence in the record was sufficient to establish good reasons for giving little weight to his opinion).

The Plaintiff further asserts that the weight given by the ALJ to the opinions of the state agency consultants constituted reversible error, particularly in light of the fact that they did not evaluate medical treatment records from the Madison Family Walk-In Clinic from July 2004 to June 2009, Joshi Clinic records from August to October 2009, and documentation from Dr. Bada from December 2010 to January 2011. However, to the extent the claimant implies that the ALJ grounded his conclusion solely on the state agency consultants' opinions, she is simply incorrect. Instead, those opinions were only one consideration among many. Moreover, the ALJ incorporated limitations supported by other evidence in the record into the RFC, namely, the

14

functional restrictions arising from Buntyn's pain, that were not included in the state agency assessments.

As noted above, the ALJ considered all of the treatment records. As he made clear, the non-examining sources' assessments of her abilities, even based as they were on incomplete records, were more consistent with the whole record, including the treatment notes of Dr. Bada, than the medical source statement that he completed. "Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ is to] give to that opinion." 20 C.F.R. § 416.927(c)(4). The ALJ committed no error. *See Knox,* 2016 WL 4430932, at *6-9 (no error where ALJ gave deference to agency consultants' opinions, even though based on incomplete records, where ALJ considered all of the records and concluded that their assessments were consistent with the record while the RFC assessment of her treating physician was contradicted by other evidence).

## *CONCLUSION*

For the reasons articulated herein, the Commissioner's determination will be AFFIRMED. A separate judgment shall issue.

IT IS SO ORDERED this 13th day of September 2016.

s/ J. DANIEL BREEN<br>
CHIEF UNITED STATES DISTRICT JUDGE